UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )  Civ. No. 00-2387 (TFH)
                                    )
                                    )
UNITED STATES MARINE CORPS,         )
                                    )
            Defendant.              )

## MEMORANDUM OPINION

Pending before the Court are renewed cross-motions for summary judgement by Plaintiff, Center for Biological Diversity and Defendant, United States Marine Corps. This dispute arises out of Center for Biological Diversity's ("Plaintiff") request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff seeks the release of documents from United States Marine Corps ("Defendant") regarding the impact of ongoing operations and future activities in upland habitats occupied by threatened or endangered species at Marine Corps Base Camp Pendleton in San Diego County, California. TFH Mem. Op. 8/21/03 at 3. On August 21, 2003, this Court ordered Defendant to turn over certain withheld documents for in camera inspection to determine whether they were privileged materials. This resulted in Defendant turning over five documents to the Court, including what was labeled as Exhibits 1, 5, 6, and 7 of the Vaughn Index and the Biological Assessment of Upland Habitats, Marine Corps Base Camp Pendleton, dated March 2000 ("Biological Assessment").

In the parties' renewed summary judgment pleadings, both Plaintiff and Defendant requested that the Court review in camera the remaining documents in dispute as the most efficient means of resolving the issue. Def.'s Reply to Pl.'s Opp'n to Def.'s Renewed Mot. for

Summ. J. at 7; Pl.'s Reply in Supp. of Renewed Cross-Mot. for Summ. J. at 8. The remaining documents concern Defendant's responses to additional information requested by the United States Fish and Wildlife Service ("FWS") after its review of the Biological Assessment submitted by Defendant. On July 8, 2005, this Court ordered Defendant to turn over for in camera review the remaining disputed documents. TFH Order 7/8/05. These fourteen documents are referred to as documents numbered 1, 4, 6, 11, 16, 27, 32, 36, 42, 48, 49, 50, 51, and 52 as described in the Base Responses Administrative Record matrix Table dated November 2003 attached to Defendant's Renewed Motion for Summary Judgment, Exhibit B ("Base Responses").

The facts surrounding this case as well as the relevant legal standard to be applied are discussed at length in pages 1-8 of this Court's Memorandum Opinion issued August 21, 2003. This Memorandum Opinion incorporates the legal discussion contained in the Memorandum Opinion of August 21, 2003 by reference and attaches that Memorandum Opinion in its entirety as attachment 1. Below, the Court puts forth its findings following the in camera inspection of the documents submitted and addresses whether each of the remaining nineteen documents should be released to Plaintiff and whether any portions of exempt documents can be segregated and released.

## DISCUSSION

### I. Biological Assessment of Uplands Habitats

The Biological Assessment is almost an exclusively factual document. It contains a significant amount of scientific data, research, and statistical figures about Camp Pendleton and Defendant's activities on base. Such compilations of data include information about the ongoing

military activities for which Defendant uses Camp Pendleton, detailed descriptions of the base's topography and the critical habitat areas, information about the endangered and threatened species of animals and plants that are at issue, and projected effects of ongoing military training and other base activities on the species in question. None of this information is advisory or deliberative in any way, but a plain account of factual information. Mead Data Cent., Inc. v. Dep't of the Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977) (indicating that only subjective, advisory material falls under the protection of Exemption 5, and that factual material must be released).

Regarding any statements in the Biological Assessment that are not a pure recitation of scientific data, the Court rejects Defendant's assertion that the ongoing consultation with FWS constitutes one long deliberative process with Defendant making its final decision after it receives the biological opinion from FWS. Def.'s Reply to Pl.'s Opp'n to Def.'s Renewed Cross-Mot. for Summ. J. at 2. Such a broad interpretation of the scope of the deliberative process is inconsistent with case law. See Mead Data, 566 F.2d at 248, 250 (D.C. Cir. 1977) (holding that the district court had applied an impermissibly broad scope to Exemption 5 when it protected documents merely because they reflected ongoing developments in a negotiating process and predated a final decision); Vaughn v. Rosen, 523 F.2d 1136, 1145 (D.C. Cir. 1975) (rejecting the government's argument that the "entire process of management appraisal, evaluation, and recommendations for improvement is a seamless whole, that is in its entirety a deliberative process" as too broad of an interpretation of the scope of Exemption 5). Accepting Defendant's interpretation of the scope of the deliberative process would virtually foreclose all public knowledge regarding agency decisions and undermine the principles of FOIA. See id. at

1145 (expressing the concern that accepting the government's broad interpretation of deliberative process would allow the policy development phase to swallow up the administrative process and would protect far more under Exemption 5 than it originally intended); see also Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 867 (D.C. Cir. 1980) (reiterating that an agency is not allowed to develop a body of "secret law" that it uses to discharge its regulatory duties, but hides from the public behind a "veil of privilege because it has not designated a decision as . . . 'final'").

The Biological Assessment does not reflect the personal views of individuals employed by Defendant, but instead is Defendant's official position on the impact of military and other base activities on listed threatened and endangered species, which indicates that the assessment is not predecisional. Costal States, 617 F.2d at 866 (indicating that documents can lose their status as predecisional documents if the agency adopts them, formally or informally, as its position on an issue).

Defendant's Biological Assessment is the consummation of its decision making process up to the time it submitted the assessment to FWS to initiate a formal consultation. Defendant engaged in a deliberative process to determine to what extent base activities impacted threatened and endangered species, making the assessment itself the culmination of that decision making process. The fact that the policy may change as a result of FWS's biological opinion does not affect the biological assessment from being Defendant's final decision at the time the assessment was given to FWS. NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 159 n.25 (1975) (reiterating that the finality of a decision is unaffected by the fact that it may be overturned on appeal). Defendant even implies that the Biological Assessment is Defendant's final evaluation of the

environmental impact in Base Response 6 when it notifies FWS to disregard previous draft biological assessments that were considered "'draft only" for discussion purposes only" and to use the final information available in the Biological Assessment dated March 2000. Base Response 6.

This Court determines that the release of the Biological Assessment will in no way risk stifling "honest and frank communication within the agency" nor will its release "inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." Coastal States, 617 F.2d at 866. Defendant's Biological Assessment constitutes a final agency opinion and is, therefore, releasable to the public under the principles of the FOIA. Because the Court determines that the Biological Assessment contains no material that would be protected by the Exemption 5 deliberative process privilege, there is no need for a segregability determination. Defendant must release the Biological Assessment in its entirety.

## II. Documents Titled "Exhibits 1, 5, 6, and 7 of the Vaughn Index"

According to Defendant's corrected Vaughn Index, Exhibit 1 is Upland Biological Assessment consultation notes of April 2000, which Defendant describes as an "[i]nternal Camp Pendleton document listing and discussing the Base's position and strategy on several aspects of the Upland BA [biological assessment] formal consultation. Prepared in advance of and as preparation for interagency discussions with the USFWS." Def.'s Notice of Filing of Corrected Vaughn Index 3/30/01, Corrected Vaughn Index at 1. The document includes four sections of Defendant's programmatic scheme for addressing the endangered and threatened species on

Camp Pendleton. These four areas include Temporary Impacts: Avoidance and Minimization; Temporary Impacts: Compensation; Permanent Impacts: Avoidance and Minimization; and Permanent Impacts: Mitigation. These four sections include largely factual descriptions of Defendant's scheme and tables with factual data regarding the occupied habitat on base.

Exhibit 1 is not entirely protected by Exemption 5 because it contains largely factual material that does not express an individual's personal and subjective opinion about Defendant's policy for addressing environmental concerns. Mead Data Cent., Inc. v. Dep't of the Air Force, 566 F.2d 242, 256 (D.C. Cir. 1997) (holding that factual material is not privileged under Exemption 5). There are portions of Exhibit 1, however, that express the author's opinion as to ways in which Defendant's approach could be improved or reconsidered. These portions, labeled within the document as "Issues to consider," are exempt under Exemption 5 because they are predecisional and express the writer's personal opinion and recommendations about ways to improve the factual explanation contained in each section of the document. Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) (explaining that documents which express a personal position, rather than the view of the agency, are protected under Exemption 5). Additionally, the portion of page 1 labeled "Note on thresholds" also appears to express the writer's opinion regarding the give-and-take of the consultative process and does not reflect a final view of the agency. If these portions of the exhibit were released, there may be a chilling effect on open discourse about policies within the agency. See Formaldehyde Inst. v. Dep't of Health and Human Serv., 889 F.2d 1118, 1125 (D.C. Cir. 1989). Therefore, these portions of the exhibit qualify as deliberative and deserve Exemption 5 protection.

The factual, nonexempt portions of Exhibit 1 are not so "inextricably intertwined with

exempt portions" that they cannot be segregated and released. Mead Data Cent., 566 F.2d at 260. Only the portions of Exhibit 1 labeled "Issues to consider" and the portion labeled "Note on thresholds" fall under the protections of Exemption 5. Therefore, the remaining portions must be released. Consequently, all of Exhibit 1 must be released, except for the bottom ten lines of text on page 1, page 2 in its entirety, the bottom 15 lines of text on page 9, the bottom 25 lines of text on page 11, and the final 15 lines of text on page 15, which constitute the sections that are exempt under the deliberative process privilege.

Exhibit 5 is a letter dated May 11, 2000 from Jim Bartel, Assistant Field Supervisor of FWS to Major General Edward Hanlon Jr., Commanding General of Marine Corps Base at Camp Pendleton. This letter describes FWS's determination of the gaps in Defendant's environmental evaluation laid out in the Biological Assessment. Such gaps include "informational gaps," wherein Defendant did not adequately describe elements of the plan, and "fundamental concepts," which are elements that the FWS felt that Defendant had misconstrued throughout the Biological Assessment.

Exhibit 5 does not fall within the deliberative process privilege because the letter does not express Mr. Bartel's individual opinion regarding Defendant's policy, but instead expresses the official position of FWS. See Formaldehyde Inst., 889 F.2d at 1122. Indeed, Mr. Bartel even uses such expressions as "we noted substantial gaps" and "our major concerns with the BA [biological assessment] are as follows," which indicate that the expressed views are the agency's and not his personal views. The document is also not deliberative because releasing this letter to the public would not discourage candid discussion within the agency because it reflects no individual's opinion, thus no individual risks public censure for expressing her views. Id. at

1125. Because this document does not meet the criteria to fall under the deliberative process privilege, it is not subject to Exemption 5 protection. The document referred to as Exhibit 5 of the Vaughn index must be released.

Exhibit 6 is a four-page memo from FWS to the Uplands Consultation Working Group, dated May 31, 2000 and titled "Additional Information Needs." This memo contains a list of fifty-three items that FWS requested from Defendant in order to fill in information gaps that FWS determined existed in Defendant's Biological Assessment. The requests of FWS include copies of Defendant's policy on certain matters, explanations for why certain material was left out of the Biological Assessment, and specific statistics.

This memo simply requests further information and contains no personal advisory opinions regarding Defendant's policy. It does not "inaccurately reflect or prematurely disclose the views of the agency," nor is it "deliberative in nature, weighing the pros and cons of agency adoption of one viewpoint or another." Costal States, 617 F.2d at 866. Exhibit 6 must be released in its entirety because it does not fall within the parameters of Exemption 5.

Exhibit 7 is described in the corrected Vaughn Index as "an internal MFR [Memorandum for the Record] detailing the discussions of the interagency Uplands BA [Biological Assessment] consultation kick-off meeting." See Def.'s Notice of Filing of Corrected Vaughn Index 3/30/01, Corrected Vaughn Index at 2. It is the minutes from a May 31, 2000 meeting to address FWS's response letter regarding Defendant's Biological Assessment. The minutes of the meeting gives each individual panel member's opinion regarding how to respond to FWS's request for additional information.

The material contained within Exhibit 7 falls entirely within Exemption 5 as it is

completely predecisional and deliberative. The entire document specifically names individuals employed by Defendant and reflects their personal views. Additionally, the document is deliberative because it reflects the give-and-take of the decision of how to respond to FWS's requests. Costal States, 617 F.2d at 866 (noting that documents reflecting individuals' opinions about agency decisions must be privileged so as to protect "honest and frank communication within the agency"). Disclosing this document would run the risk of stifling open discourse within the agency because individuals might fear public censure for openly expressing their views and keep their opinions private in the future.

Any non-exempt portions of Exhibit 7 are so "inextricably intertwined" with the privileged portions of the document that there is no releasable information that can be reasonably segregated from the privileged material. See Trans-Pacific Policing Agreement v. U.S. Customs Serv., 177 F.3d 1022, 1026-27 (D.C. Cir. 1999). Exhibit 7 is protected under Exemption 5 as a whole and there are no reasonably segregable portions that Defendant can release.

### III. Base Responses Numbered 1, 4, 6, 11, 16, 27, 32, 36, 42, 48, 49, 50, 51, and 52

Following Defendant's submission of the Biological Assessment, FWS submitted a list of 53 items which requested further information and clarification of the scope of Defendant's Biological Assessment and the factual findings Defendant made. Exhibit 6 of the Vaughn Index is the memo from FWS to Defendant that lists these 53 requests. Remaining at issue in this case are fourteen of Defendant's responses to FWS's requests, referred to as Base Responses. These documents were turned over for in camera review pursuant to the Court's Order dated July 8, 2005. What follows is a brief description of each of Defendant's Base Responses that Defendant

claims are protected by Exemption 5.

Base Response 1 responds to FWS's request for "An explanation of why only certain real estate agreements are included in the project description (pg. 8)." Defendant's response is an explanation for its reasoning in leaving out certain real estate agreements from its programmatic scheme described in the Biological Assessment. The response is entirely factual in nature and expresses no personal or subjective point of view from the author. It represents Defendant's decision for why it included certain real estate agreements in the programmatic instructions yet omitted others.

Base Response 4 replies to FWS's request for "A summary table of Programmatic Instructions that apply *Basewide*, in '*status quo*' areas, and *Management Levels 1 and 2* (pg. 10)." Defendant responded with an account of how this table came to be excluded from the Biological Assessment and where FWS could find the relevant information. This response is entirely factual as to the location of the requested information and the reasoning for the exclusion of a formal table.

Base Response 6 is in reference to FWS's request for "Clarification of acreages within Cantonment Areas," because there was a discrepancy between the draft Biological Assessment and the final one submitted in March 2000. Defendant quoted from the definition of "Cantonment Area," which was included in the Biological Assessment, and added a discussion of the term and its application to the Biological Assessment. Defendant noted that the figure in the final Biological Assessment was accurate and FWS should disregard the figures in the draft Biological Assessments. Defendant's description of the definition of "Cantonment Area" and its application to the Biological Assessment are completely factual in nature and contain no

10

subjective material.

Base Response 11 follows FWS's request for "A discussion of how to address suitable habitat areas that have not been surveyed for QCB [Quino Checkerspot Butterfly] (pg. 30)." Defendant explains that the species in question has never been recorded on Camp Pendleton, so it does not factor into its programmatic instruction analysis. This response is entirely factual.

Base Response 16 is in relation to FWS's request for "A map showing proposed PI [Programmatic Instructions] for Range 116 complex, Range 210 complex, Range 225, Range 227, Range 313, Range 407 complex, etc. (pg. 49)." Defendant's response consists of an indication as to where in the Biological Assessment FWS can look to find the desired information. The response also explains the extent to which the Stephens' Kangaroo Rat occupies various firing ranges. The response is completely factual and contains no subjective or deliberative material.

Base Response 27 refers to FWS's indication that "Table 3-3 is incomplete for several AFAs [Artillery Firing Areas] and MPs [Mortar Positions] (#s 3,5,6,7)." Defendant responded with an explanation for why certain areas of the base were not evaluated for the Biological Assessment. Again, this response is entirely factual and contains no subjective material.

Base Response 32 responds to FWS's request for "A description of cantonment areas and associated impacts (e.g., lighting impacts from housing) (pg. 97)." Defendant explains where the definition of "Cantonment" can be found in the Biological Assessment, and further explains why the associated impacts of cantonment areas were not included in the Biological Assessment. Defendant's response contains a purely factual explanation for its official position as to why it did not include associated impacts in the Biological Assessment. This is not a personal opinion

of the author, but Defendant's position. Additionally, releasing this information poses no threat to Defendant's deliberative process.

Base Response 36 follows FWS's question, "How will road maintenance activities through occupied habitat be coordinated with the Service? Class system or will long-term plan be developed within this consultation (pg. 104)?" Defendant reports that this consultation will cover routine maintenance activities, but not address new road projects, which will be covered through a separate process. This response reflects Defendant's position as to the scope of the consultation and what matters will not be covered. It is not a personal recommendation, but a statement of an official agency decision.

Base Response 42 responds to FWS's request for "A description of how PIs [Programmatic Instructions] will be enforced (pg. 135)." Defendant explains that it will respond to FWS's Biological Opinion by implementing appropriate Base Orders. It discusses the chain of command for environmental enforcement and a newly created environmental incident reporting system to track enforcement issues. This response constitutes a factual description of Defendant's plan for enforcing its environmental policy and is neither predecisional nor deliberative.

Base Response 48 refers to FWS's request for a "Definition of Class IV 'no impact' for PPM [Pacific Pocket Mouse] (pg. 156) and SKR [Stephens' Kangaroo Rat] (pg. 159)." Defendant provides its definition for the term "no impact" as Defendant used it in the Biological Assessment. This response is factual, representing Defendant's definition of a given term in the Biological Assessment. It is neither predecisional nor deliberative in any way.

Base Response 49 replies to FWS's request for a "Definition of 'potential habitat' for [the

plant species] Ea [*Eryngium aristulatum*], Nf [*Navarretia fossalis*], Bf [*Brodiaea filifolia*] (pgs. 173 & 176)." Defendant gives a technical description of the potential habitat for the plant species. This response is entirely factual in nature and contains no subjective material.

Base Response 50 is in reference to FWS's request for "A discussion of how Isolated Ephmeral Wetlands Management Plan fits into Uplands consultation (pg. 164). How will ACOE be involved in process?" Defendant explains that it does not intend to develop a Vernal Pool Management Plan, either as part of this consultation or thereafter. Consequently, ACOE will not be directly involved in the consultation process. Defendant reiterates the scope of the consultation with FWS and how it plans to consult with FWS regarding listed species on Base. This represents Defendant's official position as to the scope of the consultation with FWS. This response also contains no subjective material and does not reflect the give-and-take of the deliberative process.

Base Response 51 follows FWS's request for "A map depicting which pool groups will be fenced and which will be posted (pg. 166)." Defendant responded with an analysis of how it will make a determination of whether to post or fence areas to better manage selected vernal pools. Defendant also describes the data and factors it will consider when dealing with the threat to long term viability of vernal pools. This response is Defendant's official explanation of how it will make certain determinations regarding its environmental policy. It is not a personal, advisory opinion and releasing this information will not stifle the open discourse regarding agency actions among Defendant's employees.

Base Response 52 replies to FWS's request for "An explanation of how projects/management programs will be tracked (pg. 177)." Defendant responds by explaining

13

how it tracked projects and management programs at the time it submitted the response to FWS. Defendant also explains its plans for improving its tracking system to better integrate tracking programs into one comprehensive system. This response is factual in nature and does not contain any personal, subjective recommendations. It provides the agency policy for tracking matters and explains its official decision to alter the agency plan to better suit its needs.

None of Defendant's Base Responses to FWS's requests for "Additional Information Needs" contain information that is protected under Exemption 5. None of these responses are "predecisional" because they do not contain individual employees' recommendations regarding the programmatic instructions and the extent of the environmental impact, but instead expound and clarify Defendant's official position. See Formaldehyde Inst. v. Dep't of Health and Human Serv., 889 F.2d 1118, 1122 (D.C. Cir. 1989). Additionally, these responses cannot be categorized as "deliberative" because disclosure of the information would not discourage candid discussion among Defendant's employees regarding the agency environmental policy and this information does not reflect the give-and-take of Defendant's decisional process. Id. (defining deliberative documents as those documents which, if released, would stifle open discourse within the agency regarding policies because individuals would fear public censure for expressing their ideas); see Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). Furthermore, at the time these responses were issued, Defendant had made its decision regarding the impact on listed species and its environmental policy. All of these responses explain Defendant's analysis of the environmental impact and policy for mitigating that impact as it is described in the Biological Assessment. See Tax Analysts v. IRS, 294 F.3d 71, 80 (D.C. Cir. 2002) (explaining that the deliberative process privilege "does not . . . apply to final statements of

14

agency policy or to statements that explain actions that an agency has taken.") All of the Base Responses shall be released to Plaintiff because they do not contain any information protected under Exemption 5.

## CONCLUSION

For the foregoing reasons, both Plaintiff's and Defendant's Renewed Motions for Summary Judgement are granted in part and denied in part. Specifically, the following documents will be released to Plaintiff in their entirety: Biological Assessment of Upland Habitats, dated March 2000; Exhibits 5 and 6 of the <u>Vaughn</u> Index; Base Responses numbered 1, 4, 6, 11, 16, 27, 32, 36, 42, 48, 49, 50, 51, and 52. Exhibit 7 of the <u>Vaughn</u> Index is exempt from disclosure under Exemption 5 of FOIA because it is entirely predecisional and deliberative and there are no segregable portions of the document. Exhibit 1 of the <u>Vaughn</u> Index must be disclosed, with the privileged sections labeled "Issues to consider" and "Note on thresholds" redacted. An appropriate Order will accompany this Opinion.

September 15, 2005

/s/
Thomas F. Hogan
Chief Judge